# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RANDY LEE McBRIDE**
        **Plaintiff,**

    **v.**                                **Case No. 19-C-514**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Randy McBride applied for social security disability benefits, alleging that he could not work due to injuries to his ankle and hand. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff remained capable of a range of sedentary work and, relying on the testimony of a vocational expert ("VE"), that jobs existed in significant numbers in the economy plaintiff could still perform. Plaintiff now seeks judicial review of the ALJ's decision. On review of the record and the submissions, I find no reversible error and thus affirm the ALJ's decision.[1]

## I.  STANDARDS OF REVIEW

### A.    Disability Standard

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. <u>See</u> 20 C.F.R. § 416.920(a). Under this test, the ALJ must determine: (1) whether the claimant is working, i.e., engaging in "substantial gainful

---

[1]Plaintiff also alleged mental impairments, but he does not in this action challenge the ALJ's evaluation of those conditions, so I do not discuss them further.

activity"; (2) if not, whether the claimant has a "severe" impairment or combination of impairments; (3) if so, whether any of the claimant's impairments qualify as presumptively disabling under the agency's regulations, i.e., the "Listings"; (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of his RFC, age, education, and work experience.  See id.

The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner.  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, a chart that classifies a person as disabled or not disabled based on his age, education, work experience, and exertional ability, or by summoning a VE to offer an opinion on other jobs the claimant can still do despite his limitations.  See, e.g., Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005).  Because the Guidelines considers only exertional (i.e., strength) limitations, however, if the claimant has significant non-exertional (e.g., mental, postural or manipulative) limitations, the ALJ will consult a VE.  See id.; see also Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("The Commissioner typically uses a vocational expert ('VE') to assess whether there are a significant number of jobs in the national economy that the claimant can do.").

## B.    Judicial Review

The court "will affirm a decision on disability benefits if the ALJ applied the correct legal standards in conformity with the agency's rulings and regulations and the conclusion is supported by substantial evidence."  Prater v. Saul, 947 F.3d 479, 481 (7th Cir. 2020). "Substantial evidence" means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  L.D.R. v. Berryhill, 920 F.3d 1146, 1151-52 (7th Cir. 2019).

The court will not, under this deferential standard, re-weigh the evidence, resolve conflicts, or

substitute its judgment for that of the ALJ.  Id.

In rendering a decision, the ALJ must build a logical bridge from the evidence to her

conclusion, but she need not provide a complete written evaluation of every piece of testimony

and evidence.  Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013).  And in reviewing an ALJ's

decision for fatal gaps or contradictions, the court reads the decision as a whole and with

common sense.  See Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).

Finally, the harmless error doctrine applies to judicial review in social security cases.

E.g., Stepp v. Colvin, 795 F.3d 711, 719 (7th Cir. 2015).  The court "will not remand a case to

the ALJ for further explanation if [it] can predict with great confidence that the result on remand

would be the same."  Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013); see also Fisher v.

Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common

sense requires us to remand a case in quest of a perfect opinion unless there is reason to

believe that the remand might lead to a different result.").  While the Commissioner's lawyers

are generally forbidden, under the Chenery doctrine, from defending the ALJ's decision on

grounds that the ALJ herself had not embraced, Parker v. Astrue, 597 F.3d 920, 922 (7th Cir.

2010) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)), harmless error is an exception

to Chenery, id. at 924.

## II.  FACTS AND BACKGROUND

**A.    Medical Evidence**

Plaintiff filed the instant application in January 2015, alleging that he became disabled

as of July 2011 due to injuries to his right hand and right ankle from gunshot wounds.[2]  The

medical evidence shows that in 2004 plaintiff was shot in the right hand, between the middle

and ring fingers, after which he experienced grip weakness.  (See Tr. at 380-86.)  In 2011, he

was shot in the right ankle, undergoing surgery for bullet removal and internal fixation of the

tibia.   As a result, plaintiff's right leg is shorter than the left, causing a limp.  (See Tr. at 397-

410, 448.)   Both of these incidents occurred in Arkansas, and the record shows that he

received limited treatment during the relevant period (after January 2015).

On January 27, 2015, plaintiff was seen by Dr. Harsha Kaza in Racine, Wisconsin,

complaining of leg pain and seeking pain medication.  He had last been seen in July 2013 and

wanted a referral to a pain clinic.  He had been so referred in 2013, but no-showed.  He had

a history of alcohol, cocaine, and marijuana abuse.  (Tr. at 416.)  Dr. Kaza provided another

referral and advised him to take Naproxen.  (Tr. at 417.)

On February 24, 2015, plaintiff saw Dr. Gordon Mortenson, on referral from Dr. Kaza,

for consideration of narcotic management.  Plaintiff stated that overall he had been shot 11

times.  He reported constant pain in his right ankle/foot, aggravated by walking.  Dr. Kaza had

given him Naproxen, but plaintiff stated that did nothing; only Percocet made it better.  Plaintiff

admitted past abuse of alcohol, cocaine, and marijuana but denied current use of illicit drugs

or alcohol.  (Tr. at 418.)  On exam, he was in no acute distress.  Examination of the right foot

revealed significant scarring but reasonable range of motion of the ankle and foot.   Dr.

---

[2]The record references two previous applications.  The first, filed in 2006, was denied
by the agency.  (Tr. at 134,157, 269, 389-96.)  The second, filed in 2011, was denied by the
agency but granted by an ALJ.  (Tr. at 135, 163.)  However, it appears plaintiff's benefits were
terminated after he was incarcerated (Tr. at 82); he re-applied, via the instant application, after
his release (Tr. at 83).

Mortenson assessed neuropathic ankle/foot pain status post gunshot wound. Due to his history of illicit drug use, plaintiff was not a good candidate for opiates. Dr. Mortenson asked plaintiff to speak with their psychologist to go over opiate risk. He also asked plaintiff to provide a urine screen, but plaintiff left the clinic against instructions after giving only a tiny amount; his pants were wet for unknown reasons. He was also inconsistent regarding when he was last prescribed Percocet. Due to all of these inconsistencies, Dr. Mortenson was unwilling to prescribe narcotics. (Tr. at 419.)

On January 13, 2016, plaintiff was seen in a trauma unit in Arkansas for scalp and facial lacerations after a motor vehicle in which he was a passenger ran through a house. CT scans of the head and face revealed no fractures. (Tr. at 423-31.) On January 25, 2016, plaintiff was seen in Racine for suture removal. He also complained of chronic pain from previous accidents, and it was recommended he seek a primary care physician. On exam, he was cooperative and in no distress. (Tr. at 456-65.)

On February 23, 2016, plaintiff saw Dr. Harry Tagalakis at Advanced Pain Management in Racine, complaining of right lower extremity pain. He reported that the pain was aggravated by climbing, walking, and standing, relieved by medication. (Tr. at 433.) On exam, he had multiple right lower extremity scars, with a mildly tender area over a scar just proximal to the right ankle. He also had decreased fine touch sensation over his right tibia and right foot, and somewhat reduced strength of the right lower extremity, normal on the left. (Tr. at 434.) Plaintiff rejected all offered treatment options—gabapentin, physical therapy, and injections—instead asking for Norco, which Dr. Tagalakis refused to prescribe. (Tr. at 434-35.) Dr. Tagalakis recommended plaintiff establish care with a primary physician. (Tr. at 434.)

On June 6, 2016, Lorianne Life, program director at Racine Vocational Ministry,

prepared a letter indicating that she had been working with plaintiff since February 16, 2015. During their initial assessment, plaintiff reported that he had been shot in the right leg and hand. His right leg was noticeably shorter than the left. Ms. Life wrote:

> We addressed his limitations: these included no prolong[ed] walking, standing, bending or lifting. He often complained of having pain in both legs (over compensating on the left because of the injury on the right). Because of these limitations and [plaintiff's] limited education and work history, it was determined that he was ineligible for job services through our organization.

(Tr. at 447.) However, they continued to work with him to provide other services. Ms. Life concluded: "I believe that [plaintiff's] limitations are significant enough to keep him from sustained gainful employment and thus feel he would benefit from some form of disability support." (Tr. at 447.)

On June 19, 2016, plaintiff was seen for blisters on his feet. The note stated: "He walks a lot." (Tr. at 469.) Exam revealed a blister on the medial aspect of the left big toe and a scabbed ulcer on the dorsum of the right big toe. Wound care was provided, along with Bactrim and Tylenol #4. (Tr. at 471.)

On July 25, 2016, plaintiff was seen for a swollen and painful right ankle from all the walking he did. He reported that he was homeless and could not stay in one place for too long. On exam, he had "slight valgus deformity right ankle," trace swelling with tenderness medial and lateral, no heat or redness. (Tr. at 477.) Providers diagnosed right ankle strain and post-traumatic osteoarthritis of the right ankle, providing pain medication, an ace wrap, and a prescription for a cane. (Tr. at 478.)

On August 10, 2016, plaintiff returned to Dr. Kaza, asking for a letter stating "that he is unfit for any job. . . . He claims he can't work due to his h/o leg injury." (Tr. at 483.) Dr. Kaza noted that plaintiff "walked in here without any cane or other assistive device," reporting that

he forgot his cane in a transport van. He also asked for pain pills. Dr. Kaza reviewed his chart, indicating that there "was no documentation that he is unable to do any job." (Tr. at 483.) Regarding his request for pain pills, plaintiff was referred to the pain clinic, "but he is unhappy that [we] want to give him 'needles', not pain pills. I declined to give him any narcotics (h/o cocaine usage). Encouraged him to f/u with pain clinic of his choice." (Tr. at 483.) Dr. Kaza also declined to sign the form indicating plaintiff could not work. (Tr. at 484.)

On August 18, 2016, plaintiff saw Dr. Bindu Bamrah for right ankle pain. X-rays were taken, but it appears he was not otherwise examined or treated at that time. (Tr. at 488, 524.)

On August 22, 2016, plaintiff was seen for removal of stitches on the middle finger of his right hand. He reported that the stitches had been placed about three weeks ago after he fell and cut his finger while working at a carnival. (Tr. at 492.)

On June 29, 2017, plaintiff saw Dr. Goran Jankovic for an orthopedic evaluation of right leg and ankle pain. (Tr. at 501-02). Plaintiff reported that he had a portion of the bone removed, about three inches, and complained of pain and limitation with prolonged standing or walking. (Tr. at 502.) On exam, he displayed good range of motion of the knee and no restriction of motion of the hips. He had an antalgic gait, with a clearly visible shorter leg on the right. He also had chronic wound healing and scarring across his lower leg, and generalized diffuse pain along the distal portion of the foot and ankle. Dr. Jankovic assessed chronic foot and ankle pain with history of previous open reduction and internal fixation surgery from a gunshot wound. He concluded:

> At this point I really do not feel there is much I can offer this patient. I did refer him to the pain clinic. He has a cane that he can use for assisted ambulation. I could have him see one of our foot and ankle colleagues for a second opinion consultation. He states he has an attorney involved. I believe he is applying for disability. I would defer questions in regard to disability to the performing

surgeons that did his surgery down in Arkansas as I am not well versed in the surgery that he had and the procedures he had.

(Tr. at 503.)

On July 27, 2017, plaintiff saw Dr. Nathan Sockrider, a podiatrist, complaining of right ankle and foot pain. (Tr. at 515.) Plaintiff reported that he sustained a gunshot wound to his right leg while in Arkansas, treated initially with an open reduction internal fixation, after which he suffered an infection, undergoing incision and drainage with placement of an least one external fixator. He complained of weakness, numbness, and burning pain. On exam, he appeared well and in no distress. He had healed surgical scars to his right lower extremity, consistent with his injury and surgeries. (Tr. at 516.) He had some hypersensitivity to the scars of the right leg and ankle. He also had apparent limb length discrepancy, with a short right lower extremity compared to the left. Range of motion of the ankle and hindfoot was guarded but appeared to be without any crepitus or limitation. There was no gross malalignment other than the limb length discrepancy, and no obvious instability. X-rays revealed well healed fractures; the ankle joint appeared symmetric and intact with no degenerative arthritis; and fairly minimal angular deformity of the tibia. Dr. Sockrider diagnosed chronic right ankle and foot pain, with previous gunshot wound, fractures, multiple surgeries and infections, currently no signs of acute infection; and limb length discrepancy. He advised plaintiff to follow up with pain management for medications and prescribed a custom AFO (ankle foot orthotic) brace to assist with ambulation. (Tr. at 517.) On August 7, 2017, plaintiff was seen for fitting of the AFO. (Tr. at 601-08.)

**B.      Procedural History**

    **1.      Plaintiff's Application and Agency Decisions**

As indicated, plaintiff filed the instant application in January 2015, alleging disability as of July 16, 2011.  (Tr. at 137, 246.)  In a function report, plaintiff indicated that because his right leg was shorter than the left, he walked with a limp and had a hard time walking and standing for a long period of time.  Using a cane helped him get around better.  He also had to wear an orthopedic shoe due to removal of bone making his right leg shorter than the left.  (Tr. at 327.) He indicated that he mostly sat around the house, unless he had an appointment.  He noted no problems with personal care.  (Tr. at 328.)  He prepared his own meals but simple things because he could not stand for long.  He did household chores such as sweeping and taking out the trash.  (Tr. at 329.)  He shopped in stores for clothing and personal items.  (Tr. at 330.) He reported hobbies of reading and watching TV.  Because of his leg, he could not play sports that require running.  (Tr. at 331.)  He indicated that his impairments limited his ability to squat, bend, or kneel, or lift more than 20 pounds.  He indicated that he could walk two or three blocks before he had to stop and rest.  (Tr. at 333.)

In a physical activities addendum, plaintiff indicated that he could continuously sit as needed, stand for 20 minutes, and walk three blocks or less.  In a day, he could sit for eight hours, stand for one hour, and walk "as needed."  His doctor had limited lifting to 20 pounds. (Tr. at 335.)

The agency denied the application initially in July 2015.  (Tr. at 136, 167.)  The reviewing physician, Mina Khorshidi, M.D., noted that plaintiff alleged gunshot wounds to the legs and right hand, but the medical evidence was minimal so a consultative examination was

scheduled. Plaintiff called to reschedule but then failed to show on the new date. The claim was therefore denied for insufficient evidence. (Tr. at 140.)

Plaintiff later explained that he had been incarcerated from April 2015 to November 2015. (Tr. at 360.) On January 15, 2016, he requested reconsideration (Tr. at 171), and the agency arranged for another consultative examination.

On June 27, 2016, plaintiff was examined by Kurt Reintjes, M.D., reporting that he had been shot in the right hand between his third and fourth digits, resulting in a slight surgical correction, some loss of sensation, and what he described as complete grip strength of the right hand. He also reported being shot in the right leg, having multiple surgeries with shortening of the tibia. He complained of continued pain, unable to walk more than one block at a time. He stated that he could sit for multiple hours, but then experienced pain in his lower leg and needed to change positions. He indicated that he spent his time primarily being sedentary and lying around. He had recently tried working a sanitation job but could not handle it. He took Tylenol as needed but had been denied opioids due to his history. (Tr. at 448.)

X-rays of the right hand revealed a slight deviation at the PIP joint of the third digit, which appeared to be an old fracture, well healed. Also just distal at the MCP joint of the fourth digit appeared an old fracture with normal alignment. X-rays of the right leg revealed a very well healed fracture at the distal tibia and at the tibial talar joint, with post-surgical ossification and widening of the tibial neck, which then appeared to be old sites of hardware that had been placed. (Tr. at 449.)

Plaintiff entered the exam with an antalgic gait, with evidence that the right leg was shorter than the left. He demonstrated moderate effort on testing. (Tr. at 449.)

Examination of the upper extremities was only significant for the right hand. There was

some webbing that appeared post-surgical. Findings between the third and fourth digit did not seem to appear to limit a great deal of the range of motion of the hand. Plaintiff was able to demonstrate a grip strength of 5/5, but not as strong as that of the left hand; he did have intact dexterity with some loss of sensation at the DIP joint and tip of the middle finger. There was also a slight loss of full flexion that was just very minimal with a full grip of the right hand; otherwise, pinch strength was intact between each finger and the thumb with dexterity being intact. The left upper extremity was all within normal limits. (Tr. at 449.)

Examination of the lower extremities revealed about an inch and a half discrepancy in the length of the right leg compared to the left. There was a post-surgical indentation and gunshot wound scarring over the anterior medial aspect of the right leg. (Tr. at 449.) Plaintiff reported a significant amount of pain, and he had some loss of range of motion of the ankle. (Tr. at 449-50.) Gait and station were antalgic favoring the right leg. This did not appear to affect the hips. Dr. Reintjes concluded:

> This is a gentleman that has sustained multiple gunshot wounds with old fractures to the right hand, slightly lessened grip on the right compared to the left with dexterity still intact with a slight loss of sensation at the distal fourth digit. Also is noted that there is a significant fracture with shortening of the right leg resulting in a gait disturbance.

(Tr. at 450.)

The agency then obtained a medical review by Ronald Shaw, M.D., who opined that plaintiff could perform sedentary work with frequent (not constant) handling and fingering with the right hand. (Tr. at 152-53.) Dr. Shaw concluded:

> [Plaintiff] has minimal loss of function in his right hand and really describes no functional limitations in the ADL. He has an orthopedic shoe for his RLE, but does not use and this would improve the leg length discrepancy and possibly improve his gait and associated pain to a degree. Even so, he can sit for many hours before needing a position change and can walk and/or stand for shorter

11

periods of time with medical evidence supporting the ability to do so for 2/8 hours. He can sit for 6/8 hrs w/o need to change positions that cannot be accommodated by normal workday breaks.

(Tr. at 154.) Based on Dr. Shaw's opinion, the agency denied reconsideration in July 2016. (Tr. at 143, 155-56, 177.) In October 2016, plaintiff requested a hearing before an ALJ. (Tr. at 188.)

**2. Hearing**

On August 30, 2017, plaintiff appeared with counsel for his hearing. The ALJ also summoned a VE to the hearing. (Tr. at 73.)

In an opening statement, plaintiff's counsel noted that plaintiff needed a cane due to his ankle injury; he held the cane in his left hand, leaving his right hand to perform tasks, but that hand had residual disabilities because of the gunshot wound. (Tr. at 84.) Counsel argued that Listing 1.06 was met or equaled; he also referenced the amputation section in Listing 1.05, which talks about the loss of use of one hand and holding an assistive device in the other, making it impossible to use the hands for working. Finally, counsel argued that plaintiff met the Listings because he could not ambulate effectively without pain and had trouble with uneven surfaces and stairs. (Tr. at 85.)

**a. Plaintiff**

Plaintiff testified that he was then 36 years old, with a ninth grade education. (Tr. at 86.) He was right handed, stood 5'3" tall and weighed 152 pounds. (Tr. at 87.) He previously worked in sanitation. (Tr. at 88-89.)

Plaintiff testified that he suffered gunshot wounds to the right ankle, which resulted in the cutting of bone, without amputating the leg, making his right leg three inches shorter than

12

the left one.  (Tr. at 90-91.)  As a result, he walked with a limp and used a cane.  He stated that he could walk two or three blocks before he had to stop and rest.  (Tr. at 91.)  His doctors referred him to a foot and ankle specialist who devised a three-inch lift with a leg brace connected to it, which was in process.  (Tr. at 92.)  Plaintiff further testified that standing in one place also caused pain, but he could sit for a long period of time.  (Tr. at 92-93.)

Plaintiff also reported problems with his right (dominant) hand.  His left hand was OK, as were his arms and shoulders.  (Tr. at 93.)  Plaintiff testified that his right hand lacked grip strength and full mobility.  (Tr. at 94.)  He indicated that he could lift a gallon of milk, but gripping something heavier than that would be problematic.  (Tr. at 95-96.)

On questioning by counsel, plaintiff testified that when he sat for a long period of time he had to prop his right leg up on something.  If he did not elevate the leg, it hurt from the knee down to his big toe.  (Tr. at 102.)  He said he could sit for about 30 minutes before he had to elevate the leg.  (Tr. at 103.)

Plaintiff further stated that he had worked at a carnival for four or five days in 2016 but was let go because he fell several times.  (Tr. at 105-06.)  He indicated that he had been given a cane but lost it, leaving it on a transportation van earlier that year.  (Tr. at 106.)  The Hope Center was going to provide him with another one.  (Tr. at 107.)  He previously used crutches to walk but stopped using them when he went to jail in 2015.  (Tr. at 107.)  He testified that his doctor told him to use the cane with his left hand in order to balance the right leg.  (Tr. at 108.)  When using the cane with his left hand he could use the right hand to pick up light things, like a pillow or glass of water.  (Tr. at 108.)

Plaintiff testified that since his release from prison he had applied for jobs, seeking work that could be done seated.  (Tr. at 112-13.)  He was also working with DVR.  (Tr. at 113-14.)

13

###### b. VE

The VE classified plaintiff's past work as "sanitor," medium under the DOT ("Dictionary of Occupational Titles"), but performed at the light level as plaintiff described it. (Tr. at 115.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age and experience, able to perform sedentary work, less than occasionally operate foot controls with the right lower extremity, frequently handle and finger with the right upper (dominant) extremity, and requiring a cane for ambulation. (Tr. at 115-16.) The VE testified that such a person could not do plaintiff's past work, but that he could do other jobs, such as machine tender, order clerk, and lamp shade assembler. (Tr. at 116-17.) The VE indicated that according to Bureau of Labor Statistics data, there were about 190,000 machine tender jobs, 80,000 order clerk jobs, and 140,000 assembler jobs. However, in order to account for the use of a cane, the VE reduced the numbers to 60,000, 80,000, and 45,000, respectively. (Tr. at 116-17.)

The ALJ added a limitation of performing all lifting and carrying tasks primarily with the left upper extremity, using the right upper extremity to assist. (Tr. at 117-18.) The VE responded that this would not further reduce the numbers. (Tr. at 118.) The ALJ also asked about a requirement that the person elevate the right leg to waist level at all times while seated, and the VE said that would eliminate the jobs. (Tr. at 118.)

On questioning by plaintiff's counsel, the VE explained that he believed the sedentary work base would be eroded by about two-thirds because of the need for a cane. (Tr. at 119.) Not all jobs would be eroded; there would still be jobs available. (Tr. at 120.) The VE testified that he had identified three jobs in response to the ALJ's hypothetical but could cite more. (Tr. at 121.) Counsel referenced SSR 96-9p, which talks about "significant erosion" of the sedentary work base. (Tr. at 121.) The VE responded that he would not use the words

14

significant or insignificant but rather tried to identify the number of jobs a person with these limitations could do.  (Tr. at 122.)

The VE also clarified on cross-examination that he had factored in that the right hand is the dominant hand, and that the cane had to be held in the left hand.  The jobs would still be available.  (Tr. at 124.)  The VE explained that sedentary work is primarily done seated, leaving both hands available, and that he had reduced the numbers to account for those jobs that would require standing, walking, and carrying.  The jobs he had identified would basically be done seated all day.  (Tr. at 125.)  He further clarified that in the jobs he had identified most if not all of the lifting required would be done while seated, without any walking and carrying. (Tr. at 128.)  Finally, the VE indicated that these jobs would not require a special accommodation for use of the cane.  (Tr. at 130.)

### 3.    ALJ's Decision

On December 8, 2017, the ALJ issued an unfavorable decision.  (Tr. at 29.)  Following the five-step process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since January 22, 2015, the application date.  (Tr. at 34.)  At step two, the ALJ found that plaintiff suffered from the severe impairments of status post gunshot wound to the right ankle with chronic pain and post-traumatic osteoarthritis, status post gunshot wound to the right hand, and history of poly-substance abuse.  (Tr. at 34.)

At step three, the ALJ concluded that plaintiff's impairments did not meet or equal a Listing.  She considered plaintiff's ankle condition under Listing 1.02, finding that "the medical record does not demonstrate that [plaintiff's] ankle has been characterized by any gross anatomical deformity, such as subluxation, contracture, bony or fibrous ankylosis, or instability." (Tr. at 35.)  She also considered plaintiff's hand condition under Listing 1.02(B), finding that

"the medical record does not document involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively."  (Tr. at 35.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform sedentary work, less than occasionally operating foot controls with the right lower extremity, lifting primarily with the left upper extremity (using the right only to assist), requiring the use of a cane for ambulation, and frequently handling and fingering with the right upper extremity.  (Tr. at 36.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence.  (Tr. at 37.)

Plaintiff alleged disability due to chronic pain in the right lower extremity and right hand, secondary to gunshot wounds.  The ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence in the record.  (Tr. at 37.)

The ALJ reviewed the medical evidence, noting that the record documented sporadic treatment for plaintiff's conditions.  In January 2015, plaintiff requested referral to pain management for chronic right ankle pain, and he was seen in February 2015, indicating that he had been shot 11 times overall.  He reported difficulty walking and that he only obtained relief from Percocet.  However, examination revealed reasonable range of motion of the ankle and foot, and given plaintiff's history of illicit drug use and non-cooperation with drug screening he was not prescribed the requested narcotics.  (Tr. at 37, 416-19.)

Plaintiff received no further treatment until January 2016, when he presented to the emergency room with several lacerations after being involved in a car accident in Arkansas.

16

(Tr. at 37, 426.)  Several weeks later, he presented at Advanced Pain Management in Racine, Wisconsin, complaining of right lower extremity pain.  On exam, he had decreased fine touch sensation over his right tibia and entire right foot, as well as slightly decreased strength.  He was offered several treatment options, including gabapentin, physical therapy, and injections, but he declined and instead requested Norco, which was denied.  (Tr. at 37, 433-35.)  He was also seen for suture removed on January 25, 2016, following the earlier motor vehicle accident, and complained of chronic pain.  Providers noted he was cooperative and in no distress, and he was encouraged to establish care with a primary physician.  (Tr. at 38, 458-59.)

In her June 6, 2016, letter, Lorianne Life of the Racine Vocational Ministry indicated that she began working with plaintiff on February 16, 2015.  She felt that he had limitations attributable to his right leg condition, specifically, no prolonged walking, standing, bending, or lifting. She opined that his limitations prevented him from substantial gainful employment.  (Tr. at 38, 447.)

On June 27, 2016, plaintiff underwent a consultative medical examination with Dr. Reintjes, at which he presented with an antalgic gait and gave "moderate" effort.  Examination revealed that his right leg was an inch and a half shorter than his left, and that there was a loss of range of movement of the right ankle.  He also had slightly reduced grip strength of the right hand.  (Tr. at 38, 448-51.) As of July 13, 2016, Dr. Shaw found that plaintiff retained the ability to work at the light [sic] exertional level,[3] with additional limitations on handling and fingering with his right hand.  (Tr. at 38, 152-54.)

Plaintiff was seen on July 25, 2016, for complaints of right leg pain and request for a

---

[3]Dr. Shaw actually set the exertional level at sedentary, as the ALJ correctly noted later in her decision.  (Tr. at 39.)

cane. He was in no distress, and his ankle was noted to have "slight valgus deformity," trace swelling, and tenderness. The provider diagnosed post-traumatic arthritis of the right ankle, prescribing a cane and Vicodin. (Tr. at 38, 478.) Plaintiff returned on August 10, 2016, requesting a letter of disability secondary to his right leg condition. He walked into the appointment without a cane, stating that he had left his cane in a van. His requests for the letter and more narcotic medications were denied. (Tr. at 38, 483.) Later that month, plaintiff had x-rays of his ankle, and he was referred to a foot and ankle specialist. (Tr. at 38, 488, 524.)

On June 29, 2017, plaintiff underwent orthopedic evaluation for his right lower extremity pain with reported limitations of walking and standing. He was observed to have an antalgic gait, leg length discrepancy (shorter on the right), and generalized diffuse pain along the foot and ankle. (Tr. at 38, 501-03.) He saw a podiatrist on July 27, 2017, who prescribed custom orthotics, for which he was evaluated on August 7, 2017. (Tr. at 38, 515, 602.)

At the hearing, plaintiff testified that he could walk no more than two to three blocks before needing to rest, that prolonged standing was difficult, and that he could sit without problem but must elevate his feet after 30 minutes. He further testified that he relies on a cane for walking. (Tr. at 39.)

The ALJ found that plaintiff's allegations were not fully consistent with the objective record. Plaintiff had not sought out any regular, consistent care for his allegedly disabling leg and hand pain. On the few times he had gone for evaluation and treatment, he did so for the purpose of obtaining narcotics, declining any other offered treatment. "Nonetheless, he does have demonstrated limitations in both his hand and ankle, and must use a cane to walk, thus appropriate restrictions have been included in the given residual functional capacity in

18

consideration of those limitations." (Tr. at 39.)

Regarding the opinion evidence, the ALJ gave great weight to Dr. Shaw, who determined that plaintiff had the capacity for sedentary work with frequent handling and fingering with the right upper extremity. The ALJ found this opinion consistent with the record evidence at the time. However, the expanded record supported some additional limitations, as set forth in the RFC. (Tr. at 39.)

The ALJ gave little weight to the letter from Ms. Life, as she is not a medical professional and had not treated plaintiff's impairments. The ALJ did fully consider her narrative. (Tr. at 40.)

The consultative examiner, Dr. Reintjes, concluded that plaintiff's gait was abnormal due to the discrepancy in leg length and also noted slightly diminished hand grip on the right. The ALJ gave these findings great weight, translating them into vocational terms in the RFC. (Tr. at 40.)

The ALJ concluded that the opinions of Drs. Shaw and Reintjes, together with the treatment evidence and the claimant's own reported activities, supported a capacity for sedentary work due to a right ankle and hand impairment, with limited operation of foot controls due to the right ankle, limited lifting on the right side due to the hand injury, the use of a cane due to the ankle injury and post-traumatic osteoarthritis, and frequent handling and fingering with the right hand. (Tr. at 40.)

At step four, the ALJ determined that plaintiff could not perform his past work as a sanitary worker, medium generally, actually performed at the light level. (Tr. at 40.) Finally, at step five, the ALJ noted that if plaintiff had the RFC to perform the full range of sedentary work a finding of not disabled would be directed under the Medical-Vocational Rule 201.24.

19

(Tr. at 40-41.) However, because his ability to perform all of the requirements of this level of work had been impeded by other limitations, the ALJ consulted a VE to determine the extent to which these limitations eroded the unskilled sedentary occupational base. The VE testified that a person with plaintiff's characteristics could work as a machine tender (60,000 jobs), order clerk (40,000 jobs), and assembler (45,000 jobs). Relying on this testimony, the ALJ made a finding of not disabled. (Tr. at 41.)

On March 26, 2018, the Appeals Council denied plaintiff's request for review (Tr. at 23), making the ALJ's decision the final word from the Commissioner on plaintiff's claim. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019). The Council did grant plaintiff more time to file a civil action (Tr. at 12), and he then initiated this action for judicial review.

### III. DISCUSSION

#### A. Listings

Plaintiff first argues that the ALJ did not properly consider Listings 1.02, 1.05, and 1.06. In considering whether a claimant's condition meets or equals a Listing, the ALJ should discuss the applicable Listing by name and offer more than perfunctory analysis. See, e.g., Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015). However, the claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a Listing. Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th Cir. 2009); see Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). "An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing." Alesia v. Astrue, 789 F. Supp. 2d 921, 932 (N.D. Ill. 2011) (citing Scheck

v. Barnhart, 357 F.3d 697, 700-01 (7th Cir. 2004)).

**1. Listing 1.02**

Listing 1.02(A) requires:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.

Listing 1.00(B)(2)(b) provides:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. § 1.00(B)(2)(b).

As indicated, the ALJ found that "the medical record does not demonstrate that

[plaintiff's] ankle has been characterized by any gross anatomical deformity, such as subluxation, contracture, bony or fibrous ankylosis, or instability." (Tr. at 35.) Plaintiff argues that, contrary to the ALJ's finding, he does have instability and deformity at the right ankle, as a result of the "partial amputation" of a section of his leg. In support, he relies on his testimony that he needed a cane for stability and could not work at the carnival because he fell down. (Pl.'s Br. at 3, citing Tr. at 105, 108.)

However, plaintiff points to no objective medical evidence or opinion linking his alleged balance problems to the ankle "deformity" required by the Listing. See Thompson v. Saul, No. 18-CV-1698, 2019 U.S. Dist. LEXIS 166709, at *7 (E.D. Wis. Sept. 27, 2019) ("Without a medical opinion pointing to an objectively identified deformity as the cause of Thompson's mobility problems, the ALJ properly declined to find her presumptively disabled under Listing 1.02(A)."). To the contrary, Dr. Shaw, the only physician to evaluate the Listings in this case, concluded that plaintiff's impairment(s) did not meet any Listing. (Tr. at 143-51.) Dr. Shaw's completion of these forms conclusively establishes that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence. Scheck, 357 F.3d at 700.

While the ALJ did not specifically cite Dr. Shaw's opinion at step three, she did give that report great weight in determining RFC. (Tr. at 39.) "This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. [The court need not] discount it simply because it appears elsewhere in the decision." Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). Plaintiff presented no medical opinion of his own, see Minnick, 775 F.3d at 935 ("A finding of medical equivalence requires an expert's opinion on the issue."), nor

does he challenge Dr. Shaw's conclusions now.[4]  See Filus v. Astrue, 694 F.3d 863, 867 (7th Cir. 2012) ("Because no other physician contradicted [the agency physician] opinions, the ALJ did not err in accepting them.").

Plaintiff also failed to present evidence establishing that he could not ambulate effectively, as further required by Listing 1.02.  Plaintiff argues that due to the limited function of his right hand, and the need to use a cane with his left hand, he effectively lost functioning of both upper extremities.  (Pl.'s Br. at 4.)  The ALJ credited plaintiff's testimony that he needed a cane to ambulate, but the Listing references use of two crutches or canes, such that both of the person's upper extremities would be occupied.  Plaintiff's "use of one cane does not, without more, satisfy the definition of ineffective ambulation."  Reese v. Astrue, No. 1:07-cv-1663, 2009 U.S. Dist. LEXIS 15739, at *21 (S.D. Ind. Feb. 27, 2009); see also Greuel v. Astrue, No. 07-C-661, 2008 U.S. Dist. LEXIS 69816, at *15 (E.D. Wis. Sept. 16, 2008) ("Although the ALJ did not explicitly state that Greuel could ambulate effectively, the ALJ noted that Greuel used a cane, as opposed to two canes, to ambulate.").

The ALJ further found that plaintiff should lift primarily with the left upper extremity, using the right to assist (Tr. at 36), but plaintiff fails to explain how this equates to the loss of function of both upper extremities contemplated by the Listing.  Indeed, at the hearing, plaintiff testified that when holding his cane in his left hand he could use the right to "[p]ick light stuff up, maybe a pillow, glass of water, something that ain't too heavy, you know, I can handle it pretty much, basically."  (Tr. at 108.)  The ALJ also found, and plaintiff does not contest, that he could

---

[4]Plaintiff references Dr. Reintjes's observation of abnormal gait due to leg length discrepancy (Pl.'s Br. at 3), but he does not argue that Dr. Reintjes's findings supporting a Listing claim.

frequently handle and finger with the right upper extremity.  (Tr. at 36.)

Finally, plaintiff argues that his testimony about falls while working at the carnival establishes that he could not walk on rough or uneven surfaces.  (Pl.'s Br. at 4-5.)  But he does not develop the argument, see Lauth v. Covance, Inc., 863 F.3d 708, 718 (7th Cir. 2017) (stating that perfunctory and undeveloped arguments are waived), or otherwise demonstrate that the ALJ erred in this regard given the opinions of Drs. Shaw and Reintjes that plaintiff could despite his abnormal gait stand/walk as required for sedentary work (Tr. at 40, 150, 449-50), and the other evidence, cited by the ALJ, of ability to ambulate even when not using a cane (Tr. at 38, 483).

### 2.    Listing 1.05

Listing 1.05 applies in cases of amputation (due to any cause) of:

A. Both hands;

or

B. One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b , which have lasted or are expected to last for at least 12 months;

or

C. One hand and one lower extremity at or above the tarsal region, with inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.05; see, e.g., Soles v. Colvin, No. 1:13CV491, 2015 U.S. Dist. LEXIS 158512, at *17 (M.D.N.C. Nov. 23, 2015) ("For example, a claimant who lost her foot due to amputation could only qualify under Listing 1.05 if the amputation occurred at or above the tarsal [ankle] region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively.") (internal quote marks omitted).

24

Plaintiff references his "partially amputated right leg" (Pl.'s Br. at 4), but the medical evidence documents no such amputation. Indeed, at the hearing, plaintiff testified: "They had to cut my bone without amputating my leg, yes." (Tr. at 91.) Dr. Reintjes examined plaintiff's lower extremities, noting no amputation but "about an inch and a half discrepancy in the length of the right leg compared to that of the left." (Tr. at 449.) Because there was no evidence of amputation, the ALJ was not required to discuss Listing 1.05. See Levins v. Astrue, No. 09-C-1067, 2010 U.S. Dist. LEXIS 53222, at *14 (E.D. Wis. May 10, 2010) ("An ALJ is not required to explicitly reference every conceivably applicable Listing and provide a detailed analysis as to why he finds that the claimant's impairments do not meet or medically equal the Listing."); see also Winters v. Astrue, No. 11-690-CJP, 2012 U.S. Dist. LEXIS 72214, at *21 (S.D. Ill. May 24, 2012) ("The ALJ is not required to discuss a Listing where there is no evidence the Listing was met.") (citing Scheck, 357 F.3d at 700). Further, as discussed above, plaintiff failed to present evidence establishing that he could not ambulate effectively, as also required by this Listing.

### 3. Listing 1.06

Listing 1.06 applies to fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, with:

> A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid;
>
> and
>
> B. Inability to ambulate effectively, as defined in 1.00B2b , and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.06.

The ALJ failed to discuss this Listing, but the error was harmless. See Greuel, 2008

25

U.S. Dist. LEXIS 69816, at *13 ("The ALJ must set forth some analysis in her decision, but the law does not necessitate reversal and remand if the ALJ merely fails to explicitly refer to the relevant listing.") (citing Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir. 2004)). First, plaintiff does not even attempt to show that he satisfies sub.(A) of the Listing. Dr. Reintjes noted on review of x-rays "a very well healed fracture at the distal tibia and at the tibial talar joint" (Tr. at 449), and the ALJ generally credited his findings (Tr. at 40). Second, the ALJ credited the opinion of Dr. Shaw, who explicitly considered Listing 1.06 (Tr. at 39, 151), and plaintiff presented no contrary opinion. See Filus, 694 F.3d at 867 (holding that ALJ did not err in accepting agency opinions when no other physician contradicted then). Third, plaintiff failed to establish that he could not ambulate effectively, as discussed above.

**B.      RFC**

Plaintiff next argues that, contrary to SSR 96-8p, the ALJ failed to provide the required narrative discussion describing how the evidence supported the RFC. (Pl.'s Br. at 5, citing Briscoe, 425 F.3d at 352 ("[T]he ALJ did not explain how he arrived at these conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").) As summarized above, the ALJ reviewed the treatment records, plaintiff's statements regarding his symptoms and limitations, and the opinion evidence. (Tr. at 37-40.) Relying on the opinions of Drs. Shaw and Reintjes, she limited plaintiff to sedentary work with frequent handling and fingering with the right upper extremity, and, giving some weight to plaintiff's statements, included additional limitations, i.e., use of a cane and limited lifting on the right. (Tr. at 39-40.) However, she declined to fully credit plaintiff's statements, finding them not fully consistent with the objective record, including his limited treatment and drug-seeking behavior. (Tr. at 39.) This discussion satisfied the ALJ's duty to "minimally articulate" her justification. See Berger v. Astrue, 516

26

F.3d 539, 545 (7th Cir. 2008).

Plaintiff points to no medical opinion supporting greater limitations. <u>See</u> <u>Best v. Berryhill</u>, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting <u>Rice</u>, 384 F.3d at 370); <u>see also</u> <u>Castile</u>, 617 F.3d at 927 ("It is Castile, however, who bears the burden of proving that she is disabled, and she failed to present any medical evidence [establishing disabling limitations.] Contrary to her claims, none of Castile's treating physicians opined that she was incapable of working."). Indeed, as the ALJ noted, one of plaintiff's providers declined to support his disability claim. (Tr. at 38, 483.)

The only specific error plaintiff alleges is that the ALJ did not explicitly reject his testimony that he needed to elevate his leg after sitting for 30 minutes. (Pl.'s Br. at 5, citing Tr. at 102.) Plaintiff argues this was harmful, as the VE testified that a person who needed to elevate his leg to waist level while seated could not perform the cited jobs. (Pl.'s Br. at 6, citing Tr. at 118.)

However, "an ALJ's credibility findings need not specify which statements were not credible." <u>Shideler v. Astrue</u>, 688 F.3d 306, 312 (7th Cir. 2012); <u>see also</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997) (noting that the ALJ need not specifically discuss every piece of testimony). Here, the ALJ summarized plaintiff's testimony, including his claim that he had to elevate his feet after 30 minutes, then concluded that his allegations were not fully consistent with the objective record. (Tr. at 39.) She credited his claims regarding use of a cane and limited use of the right hand, implicitly rejecting his claims of greater limitations. <u>See</u> <u>Sawyer v. Colvin</u>, 512 Fed. Appx. 603, 608 (7th Cir. 2013) ("Credibility assessments need not be explicit, <u>Arbogast v. Bowen</u>, 860 F.2d 1400, 1406 (7th Cir. 1988), or particularized to specific

27

testimony, Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012)).”); see also Outlaw v. Astrue, 412 Fed. Appx. 894, 898 (7th Cir. 2011) (“The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible.”).

Plaintiff does not contest the specific reasons provided by the ALJ for her credibility assessment or otherwise seek to demonstrate that it was “patently wrong.” See Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (“We may disturb the ALJ’s credibility finding only if it is ‘patently wrong.’”). Nor does plaintiff cite any medical evidence supporting the need to elevate his legs. See Britt v. Berryhill, 889 F.3d 422, 425-26 (7th Cir. 2018) (declining to reverse, despite ALJ’s failure to specifically discuss claimant’s testimony that he needed to elevate his legs, where medical evidence failed to support such a limitation). Plaintiff’s RFC claim accordingly fails.

## C.    Erosion of Sedentary Occupational Base

Finally, plaintiff argues that the ALJ failed to properly consider the significant erosion of the sedentary work base resulting from his need for a cane and limited use of the right hand. (Pl.’s Br. at 6.) Plaintiff notes that, under SSR 96-9p, “a finding of ‘disabled’ usually applies when the full range of sedentary work is significantly eroded.” 1996 SSR LEXIS 6, at *7-8. The Ruling gives these examples:

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.

Id. at *19-20.

Any _significant_ manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.

Id. at *22-23.

The Ruling concludes:

When the extent of erosion of the unskilled sedentary occupational base is not clear, the adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the Occupational Outlook Handbook, or County Business Patterns.

In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.

Id. at *26-27 (footnote omitted).

Plaintiff argues that this final passage makes clear that the ALJ retains the duty to determine the extent of the erosion of the occupational base even when consulting a VE. He contends that in his case the VE estimated a two-thirds erosion of the sedentary base, and the ALJ should have determined whether this was "significant." He further contends that, unlike the example quoted above, he is unable to use his right hand for lifting and carrying while holding his cane in his left hand, and that his unique situation results in a significant erosion of the sedentary work base. He concludes that the ALJ's failure to follow the SSR is grounds for remand. (Pl.'s Br. at 8.)

Plaintiff cites no case holding that the ALJ was required to do more than she did here: consult a VE, present plaintiff's characteristics and limitations, and then determine whether a person with such limitations could still perform a significant number of jobs. See Sherlyn M.

29

v. Saul, 408 F. Supp. 3d 931, 944 (S.D. Ind. 2019) (finding that ALJ complied with SSR 96-9p when he found the claimant capable of a reduced range of sedentary work, presented those limitations to the VE, and the VE testified that there were jobs available); Groves v. Comm'r of Soc. Sec., No. 3:11-cv-105, 2012 U.S. Dist. LEXIS 309, at *23-24 (S.D. Ohio Jan. 3, 2012) (finding no error where the ALJ consulted a VE to determine the extent of erosion of the occupational base, presented the VE with an accurate hypothetical, and considered the VE's testimony on available jobs in the region); see also SSR 96-9p, 1996 SSR LEXIS 6, at *1 ("[A] finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.").

In her decision, the ALJ wrote:

> If [plaintiff] had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.24. However, [plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with [plaintiff's] age, education, work experience, and residual functional capacity.

(Tr. at 41.)

In response to the ALJ's inquiry, the VE identified 60,000 machine tender jobs, 40,000 order clerk jobs, and 45,000 assembler jobs. (Tr. at 41.) The VE specifically reduced the numbers to account for plaintiff's use of a cane and right hand limitations. (Tr. at 116-17.) He also answered questions from plaintiff's counsel regarding the erosion of the sedentary base

due to these limitations, as indicated above. (Tr. at 121-22.) Plaintiff's counsel did not object to the VE's qualifications, methodology, or the numbers he ultimately provided. See Brown v. Colvin, 845 F.3d 247, 254 (7th Cir. 2016) ("Brown . . . forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing."); see also Liskowitz, 559 F.3d at 743 ("[I]t appears to be well-established that 1,000 jobs is a significant number.").

Based on the VE's testimony, the ALJ concluded that, "considering [plaintiff's] age, education, work experience, and residual functional capacity, [plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. at 41.) Plaintiff fails to demonstrate that the ALJ erred under SSR 96-9p. See Liskowitz, 559 F.3d at 745-46 ("Where, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony.").

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of March, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge